# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In the Matter of a Warrant for All
Content and Other Information
Associated with Six Slack.com
Workspaces, all Maintained at Premises
Controlled by Slack Technologies Inc,
USAO Reference No. 2018R00088.

---

# 18 MAG 2675

### TO BE FILED UNDER SEAL

#### AGENT AFFIDAVIT

### Agent Affidavit in Support of Application for a Search Warrant
### for Stored Electronic Communications

STATE OF NEW YORK    )
                      ) ss.
COUNTY OF NEW YORK  )

      BRANDON RACZ, being duly sworn, deposes and states:

## I. Introduction

### A. Affiant

      1. I am a Special Agent with the Federal Bureau of Investigation (the "Investigating

Agency"). As such, I am a "federal law enforcement officer" within the meaning of Federal Rule

of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws and duly authorized by the Attorney General to request a search warrant. During my tenure

with the FBI, I have participated in the investigations of numerous frauds, and have conducted

physical and electronic surveillance, the execution of search warrants, debriefings of informants,

and reviews of taped conversations. Through my training, education, and experience, I have

become familiar with the manner in which securities frauds are perpetrated.

### B. The Provider, the Subject Workspaces, and the Subject Offenses

      2. I make this affidavit in support of an application for a search warrant pursuant to 18

U.S.C. § 2703 for all content and other information associated with the following Slack.com

workspaces: (a) centratech.slack.com ("Subject Workspace-1"); (b) Centra-tech.slack.com ("Subject Workspace-2"); (c) centraadmin.slack.com ("Subject Workspace-3"); (d) Centrateam.slack.com ("Subject Workspace-4"); (e) Centrateam1.slack.com ("Subject Workspace-5); and (e) centrawork.slack.com ("Subject Workspace-6," together with Subject Workspace-1, Subject Workspace-2, Subject Workspace-3, Subject Workspace-4, and Subject Workspace-5, the "Subject Workspaces"), maintained at premises controlled by Slack Technologies Inc located at 155 5th Street, 6th Floor, San Francisco, California 94103, United States ("Slack" or the "Provider").

3. As detailed below, there is probable cause to believe that the Subject Workspaces contain evidence, fruits, and instrumentalities of violations of securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; offering and selling unregistered securities, in violation of Title 15, United States Code, Sections 77e and 77x; wire fraud, in violation of Title 18, United States Code, Section 1343; aiding and abetting the commission of these offenses, in violation of 18, United States Code, Section 2; and conspiring to commit these offenses, in violation of 18, United States Code, Sections 371 and 1349 (the "Subject Offenses"). This affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers, as well as my training and experience concerning the use of electronic communications in criminal activity. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts I have learned during my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**C. Services and Records of the Provider**

4.  Based on my training and experience, and from information provided to the FBI by the Provider, I have learned the following about the Provider:

a.  Slack owns and operates a website of the same name—https://slack.com—which offers users a digital workspace, allowing groups of people to communicate with each other and collaborate on projects through real-time messaging, document sharing, archiving, and search functions.

b.  A Slack "team" is a group of people who use Slack to communicate.  A Slack "workspace" is a digital space that Slack users and their teammates share to communicate and collaborate on, for example, work projects.  As advertised by Slack, Slack users from a small or medium-sized company are likely to all be members of one Slack workspace.  Slack users who are part of a larger organization—for example, comprised of multiple locations, people, and subgroups—might have multiple, interconnected Slack workspaces.  Each workplace may be independent, but all would be interconnected and powered through Slack's "Enterprise Grid," which allows users to manage security, policy, and compliance across multiple Slack workspaces.

c.  Each Slack workspace is comprised of "channels."  Slack users use channels to communicate with other members.  Slack channels could be organized in any manner—for example, by a project, office location, or department.  Slack offers three types of channels— "public," "private," and "shared":

i.  A Slack public channel is open to an entire team of users in a workspace. Messages within a public channel are archived in Slack and searchable by all members, except for "guest" users in a workspace.  Slack public channels are identified by a # hashtag symbol next to the name.

3

      ii.  A Slack private channel allows a group of teammates to discuss and share privately within Slack.  Users have to be invited into a Slack private channel in order to see and search for its contents.

      iii.  A Slack shared channel operates as a bridge that connects a channel in a workspace with another company's Slack workspace.  Shared channels can be public or private.

      d.  In addition to sharing messages in channels, Slack users can send messages, files, and notes to each other through one-on-one direct messages and group direct messages.

      e.  Slack users can "pin" messages, which is a way of identifying an important message or file and a way to save information to any Slack channel or direct message so that the Slack user and other workspace members can access it at any time.

      f.  Slack users can use "posts" as a way to share long-form, formatted content—like project plans or documentation—directly in Slack.  Slack users can also share "snippets," which are a way to share bits of code or plain text with people in the workspace.

      g.  Slack also offers "integrations" to its users, which is a way of connecting other electronic applications—for example, file- and document-sharing applications provided by Google Docs and Dropbox—to a Slack workspace.

      h.  Slack users can join Slack workspaces by accepting email invitations or creating an account on a workspace using a company email address.

      i.  Slack users can create "profiles" that include photographs, telephone numbers, and other information.  Slack users can also update their "status" on their profile.

      j.  A Slack workspace "owner" is a user who controls the highest-level security and administrative settings on a workspace, including payments, authentication method, and security

possibilities. A Slack workspace "admin" has administrative powers over a Slack workspace, including managing members, moderating channels, and other maintenance tasks.

k. Slack users can "archive" a channel, which removes it from the list of active conversations in a Slack user's workspace. An "archived" channel is not open for new activity, but the history is retained for browsing and searching.

l. Slack workspace owners and administrators can export data from a workspace, including content from public and private channels and direct messages, depending on the type of free or paid plan associated with a workspace.

m. A Slack "timestamp" shows the exact date and time that something in Slack took place, such as when a message was sent or when a file was shared.

n. Slack maintains information about its users' accounts, such as information about the length of service (including start date), the types of services utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). Slack also retains IP logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Slack, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. Slack also maintains messages, files, and notes that Slack users exchange with each other through Slack channels or direct messaging within a workspace.

o. Slack offers "free" plans and "paid" plans for its workspaces. Slack's default message retention setting for all workspaces is to retain all messages in channels and direct messages, for all members, for as long as the workspace exists. For Slack workspaces on the paid plan, workspace Administrators can manage message retention settings more specifically. Administrators can choose, for example, to automatically delete messages or to retain all versions

5

of edited and deleted messages for channels and direct messages for a set time period. For Slack workspaces on the free plan, if a Slack user has the option to edit messages, only the most recent version of the message will remain. By default, Slack saves files submitted to a workspace for the lifetime of the workspace. Slack users can also choose to delete files after a specific number of days or years.

### D. Jurisdiction and Authority to Issue Warrant

5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Provider, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

7. When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation. 18 U.S.C. § 2705(b).

## II. Probable Cause

### Overview of the Scheme

8. As set forth in greater detail below, there is probable cause to believe that, from approximately July 2017 through the present, certain members of Centra Tech, Inc. ("Centra

Tech"), a cryptocurrency exchange company, engaged in a scheme to raise capital by offering unregistered securities to the public, and, in doing so, made multiple misrepresentations to the public about, among other things, the technology and products offered by Centra Tech, and its partnerships with certain financial institutions.

### Relevant Entities

9.  Based on my review of publicly available information and records provided by Centra Tech to representatives of the U.S. Securities and Exchange Commission ("SEC"), I have learned the following, in substance and in part:

a.  Centra Tech is a Delaware corporation based in Miami Beach, Florida.  Centra Tech advertises itself through its website, https://centra.tech (the "Centra Tech Website"), press releases, and statements on the Internet as a company that offers various methods to store and spend digital assets such as cryptocurrencies.  For example, the Centra Tech Website currently advertises that Centra Tech "offers blockchain products such as a Wallet to store digital assets, a Prepaid Card to spend the digital assets, and three soon to be released products and services, which include a Marketplace to buy goods with the digital assets, a cryptocurrency Exchange Platform to buy, sell and trade digital assets, and a open-source hyper speed DPoS Blockchain."

b.  The following individuals, among others, are or have been employed at Centra Tech:

i.  Sohrab Sharma, a/k/a "Sam Sharma," ("Sharma") was a founder of Centra Tech, its President, and its Chief Technology Officer.

ii.  Raymond Trapani ("Trapani") was a founder of Centra Tech and its chief operating officer.

iii.     On October 31, 2017, Centra Tech announced that co-founders Sharma and Trapani were "stepping aside to support the continued growth of the company," and announced a "reconstituted executive management team" that did not include Sharma or Trapani.

iv.     Robert Farkas ("Farkas") has held various positions at Centra Tech, including as its chief marketing officer. Farkas is currently its chief operating officer.

10. The Bancorp, Inc. ("Bancorp") is a Delaware-based financial services company with offices throughout the United States. Bancorp provides a variety of financial services to companies and individuals, including issuing debit and prepaid cards, and payments processing, which it does by virtue of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

11. Visa Inc. ("Visa") is a U.S.-based multinational financial services corporation headquartered in Foster City, California. Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

12. Mastercard Incorporated ("Mastercard") is a U.S.-based multinational financial services corporation headquartered in Purchase, New York. Mastercard's principal business is to process payments between the banks of merchants and the card issuing banks or credit unions of the purchasers who use the "Mastercard" brand debit and credit cards to make purchases.

### Relevant Regulatory Background and Definitions

13. An "initial coin offering" ("ICO") is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration often comes in the form of "virtual currency" or "cryptocurrency," but can also be "fiat currency," which is currency, like the U.S. dollar and the Euro, that a government has declared to be legal tender, but is not backed by a physical commodity. "Virtual currency" or

"cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, and/or (3) a store of value, but does not have legal tender status. Unlike fiat currency, like the U.S. dollar and the Euro, virtual currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. Examples of virtual currency are Bitcoin and Ether.[1]

14. The tokens or coins issued in an ICO are issued and distributed on a "blockchain" or cryptographically-secured ledger. Tokens often are also listed and traded on online platforms, typically called virtual currency exchanges, and they usually trade for other digital assets or fiat currencies. Often, tokens are listed and tradeable immediately after they are issued.

15. ICOs are typically announced and promoted through the Internet and e-mail. Issuers usually release a "whitepaper" or "white paper" describing the project and the terms of the ICO. In order to participate in the ICO, investors are generally required to transfer funds to the issuer. After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants. The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called virtual currency exchanges, and be tradable for virtual currencies.

16. Under Section 2(a)(1) of the Securities Act of 1933, a security includes "an investment contract." 15 U.S.C. § 77b. An "investment contract" is a contract, transaction or scheme "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C.* v. *W.J. Howey Co.*, 328 U.S. 293, 298–

---

[1] Based on my training, experience, and participation in this investigation, I have learned that "Ether" is a cryptocurrency whose blockchain is generated by the Ethereum platform, and the term "Ether" is sometimes used interchangeably with "Ethereum."

99 (1946). "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301. Importantly, the economic realities of the transaction or product and not its name determines whether the instrument is a security. *United Hous. Found, Inc.* v. *Forman*, 421 U.S. 837, 851 (1975). Pursuant to Sections 5(a) and 5(c) of the Securities Act, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC. 15 U.S.C. § 77e(a) and (c).

### The Centra Tech ICO

17. As discussed below, there is probable cause to believe that, from in or about July 2017 through in or about October 2017, Centra Tech raised capital, by offering unregistered securities via an ICO, to operate what they advertised would be the world's first multi-blockchain debit card (the "Centra Tech ICO"). In sum, Centra Tech accepted digital currency from investors in exchange for Centra Tokens that Centra Tech stated could be "exchange[d] . . . on the Cryptocurrency exchanges for a profit" and would "allow[] users to join [Centra Tech's] success and mission *while generating a profit*." (emphasis added). In doing so, Centra Tech made multiple false statements, including on the Centra Tech Website and in materials posted to the Centra Tech Website, regarding, among other things, (a) the "Centra Card" or the "Centra Debit Card," a debit card that was falsely advertised as one that would allow users to make purchases using any blockchain currency of choice and would work at any location that accepted Visa, (b) Centra Tech's partnerships with Bancorp and Visa, which did not exist, (c) individual state licenses held by Centra Tech, at least some of which did not exist, and (d) the identity of one of Centra Tech's executives, who does not appear to exist.

10

18. Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, among other sources, I have learned the following, in substance and in part:

a.  In or about July 2017, Centra Tech began marketing an ICO scheduled to begin on August 5, 2017 and end on October 5, 2017 (the Centra Tech ICO or the "ICO").  In advance of the ICO and during the ICO, Centra Tech released multiple versions of a whitepaper, issued press releases, paid for placement of press releases on various websites, and engaged in a social media marketing campaign using various social media platforms, including Facebook, Twitter and YouTube.

b.  On or about July 20, 2017, Centra Tech posted a link to its "White Paper draft version 1.6" on its Twitter page.  The website address for the link was https://wp.centra.tech.

c.  On or about July 22, 2017, Centra Tech posted a link to a white paper on its Facebook page.  The link was www.Centra.Tech/CentraWhitePaper.pdf, a page on the Centra Tech Website.

d.  On or about July 23, 2017, Centra Tech issued a press release that it paid to be published on the website "cointelegraph.com" (the "July 23 Press Release").  In the July 23 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees."  The July 23 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their

cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance." The July 23 Press Release also advertised Centra Tech's "Currency Conversion Engine" as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard." The July 23 Press Release stated that the Centra Tech Website "contains comprehensive information about this offering," and directed readers to the Centra Tech Website, www.centra.tech, and email address, support@centra.tech.

e. On or about July 25, 2017, Centra Tech issued a press release that it paid to be published on the website Bitcoin.com (the "July 25 Press Release"). In the July 25 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees." The July 25 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance." The July 25 Press Release also advertised Centra Tech's "Currency Conversion Engine," as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard." Like the July 23 Press Release, the July 25 Press Release also directed readers to the Centra Tech Website, www.centra.tech, for "comprehensive information about this offering," and provided a press contact email address, press@centra.tech.

f.   Centra Tech also posted several different versions of a white paper advertising the Centra Tech ICO on the Centra Tech Website.   A version of the ICO White Paper that was downloaded from the Centra Tech Website on or about August 3, 2017 and labeled "FINAL DRAFT" ("White Paper-1") contained several statements describing the ICO and the Centra Card using terminology indicative of a securities offering.   For example:

i.   White Paper-1 described the Centra Tech ICO as a token offering for which 400 Centra Tokens, or "CTR"s, would be sold for 1 ETH.   Based on my training, experience, and participation in this investigation, I have learned that "ETH" is the currency code for Ether, a cryptocurrency whose blockchain is generated by the Ethereum platform.

ii.   Centra Tech stated that it would be offering "68% of all [Centra] Tokens to be created for purchase in our crowd sale to the public" and would "allocate 20% of all [Centra] Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" while "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive to create a long lasting mutual interest and dedication to the tokens and their prolonged value."

iii.   In providing details about the Centra Card and the Centra Tech ICO,  White Paper-1 referenced different levels of investment opportunity:

1.   The "Centra Black Card founders edition" was to be issued to "our first 500 ICO backers whom purchase with 100+ ETH" and would carry with it an "enhanced rewards program."

2.   The "Centra Gold Card limited edition" would be "allocated to our first 1000 contributors whom purchase CTR Tokens with 30+ ETH," and would also carry an "enhanced rewards program."

3. The "Centra Blue & Virtual Card" would be the "signature and traditional card."

iv. White Paper-1 advertised multiple "rewards" programs for Centra Token holders. For example, White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program"). This was in contrast to another rewards program advertised in White Paper-1, which offered "Card rewards of up to 2% of your purchases made on the Centra card." Based on my review of White Paper-1, and representations made by Sharma, as described in paragraph 18.h., below, explaining that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens," I believe the Network Rewards Program functions like a dividend in that it is offering a share – .8% ETH – of Centra Tech's revenue.

v. Although it claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra Tokens "are not securities nor shares," White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit." White Paper-1 also claimed that the Centra Card and Centra Wallet were "already live in beta," and that Centra Tech was "offering our initial crowd sale of tokens to appropriately fund the vision of Centra Tech's future." It further claimed that Centa Tech's "initial coin offering allows users to join our success and mission *while generating a profit*." (emphasis added).

g. White Paper-1 also contained several misrepresentations, as described further in paragraphs 19 through 26, below, about Centra Tech's relationships with financial services institutions. For example:

14

i.     In describing the Centra Card, White Paper-1 stated: "For our United States clients the Centra Card will be a Visa card while for international users the Centra card issued will be a MasterCard. . . . The Centra Card allows all supported cryptocurrencies to become spendable in real time based on the government fiat being used at the time the card is used at a participating location that accepts Visa or MasterCard."

ii.    White Paper-1 contained multiple images of Centra Cards with the "Visa" logo:





iii.    White Paper-1 also stated that one benefit and advantage of the Centra Card was "Access to 36+ Million Points of Sale where Visa and/or Master-Card is accepted in 200+ countries."

iv.    A product comparison table in White Paper-1 reported that the issuers of the Centra Card were "MasterCard and Visa."

v.    White Paper-1 contained a timeline of Centra Tech's "milestone items," including a "Major Banking Partnership signed and license agreement with VISA USA Inc

formulated" in January 2017, and a "Beta Launch of Centra Black Card and Centra Wallet App Live" in March 2017.

vi.    White Paper-1 also used the logos of Bancorp and Visa when describing Centra Tech's partners:

### 7.1 Centra Tech Partners

 

vii.    White Paper-1 stated that "Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia."   It further stated that the licenses "are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."

viii.    White Paper-1 advertised the "Centra Tech Team" as comprising, among other individuals, Sharma as the "CTO & Co-Founder"; Trapani as the "COO"; Farkas as the "CMO"; and "Michael Edwards" as the "CEO & Co-Founder."   The below pictures of the "Centra Tech Team" were provided along with their purported titles:

 WHITE PAPER                                                    CENTRA TECH

## 7.5 CENTRA TECH TEAM


**Michael Edwards**
CEO & Co-Founder


**Sam Sharma**
CTO & Co-Founder


**Raymond Trapani**
COO


**Jessica Robinson**
CFO


**Robert Farkas**
CMO


**Martin Pejkov**
Marketing Director


**Andrey Nechosov**
Blockchain Founder


**Filip Burcevski**
Technology Director


**Ivan Jin**
Native Engineer


**Kumar Singh**
Backend Engineer


**Steve Stanely**
PR Director


**Peter Aziz**
Financial Manager

As depicted above, White Paper-1 provided a photograph of "Michael Edwards" and identified "Michael Edwards" as the "CEO & Co-Founder" of Centra Tech.

 h. On August 14, 2017, Sharma was interviewed by Neocash Radio, a cryptocurrency podcast, about the Centra Tech ICO. During that interview, Sharma stated, among other things, the following:[2]

  i. "[I]nternationally, we currently have our license with Mastercard, to service international clients. Domestically, we do have the Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally."

  ii. "Right now we are currently in our live Beta stage, which we have members of our internal organization as well as some external that have gotten our Centra Black Founder cards recently. We're going through . . . pretty much a phase two of testing right now where we

---

[2] The summaries and transcript of the recorded interview set forth herein is based on a preliminary draft transcription and remains subject to revision.

are just going through daily transactions, testing volume, etc., and we've gotten really good results so far on it."

      iii.  Sharma also stated that Centra Tech had "pretty much a successful test rate in terms of errors, in terms of proof processes and the whole flow of the card attaching to the app," when discussing the Centra Wallet.

      · iv.  Sharma identified "Mike Edwards" as a "VP and co-founder" who was an early investor in Centra Tech.

      v.  In describing the rewards system for purchasers in the ICO, Sharma stated: "The rewards percentage that we get from Visa and Mastercard through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra tokens."

      vi.  "[R]ight now is a great time to join our system, we have a token sale that is going on, it finishes on October 5th . . . we're currently a little bit north of $10 million raised in our first eight days of our crowd sale so I definitely want to thank all of my contributors and anyone who is listening for joining that as well."

      vii.  Sharma stated that there was currently a 20% token bonus on top of the current token sale that "can be redeemed via email."

      viii.  "We have a couple of large deals we're working on right now with a few companies so we should be over by I would say early September."

      ix.  Sharma directed listeners to the Centra Tech website, www.centra.tech, to find out more about the Centra Tech ICO: "You can go to our website, www.centra.tech, and you can click the token sale page as well as our white paper is on there and you can just get an insight of everything from A to Z."

x.   Sharma stated that while Centra Tech was licensed in 38 states, "the states that we are operating in currently for licensing purposes is just so the ability to withdraw and transmit your Bitcoins.  As far as actually utilizing the card itself to the wallet and spending the cryptocurrencies, that's available in all states."

xi.   Sharma also stated that he was able to work through the U.S. licensing issues with a contact he knew at Metropolitan Commercial Bank.  Sharma stated that "our system is connected to the bank and we're connected to the clients."

19. Based on my conversations with a representative of Bancorp ("Witness-1") and my review of documents provided by Bancorp, I have learned, in substance and in part, the following:

a.   In approximately August 2017, Witness-1 learned from Bancorp's marketing group that a potential investor or purchaser of Centra Tech tokens had inquired as to whether Bancorp had a business relationship with Centra Tech, as was represented by Centra Tech in its marketing materials at the time.

b.   In investigating the inquiry in approximately August 2017, Witness-1 reviewed the Centra Tech Website and a white paper posted on the Centra Tech Website.  Witness-1 discovered that Bancorp's issuer statement, a statement regarding who the card issuer is any time a Visa or Mastercard image is displayed, was being used on the Centra Tech Website.  Witness-1 knew by looking at the Centra Tech Website and white paper that Bancorp would not ever work with a company such as Centra Tech by virtue of the risk level of the product Centra Tech was offering.

c.   Witness-1 reviewed Bancorp internal databases, to include Bancorp's list of entities with which it had card issuance relationships and entities involved in Bancorp's co-branded incentive card program, to see whether Bancorp had any sort of relationship with Centra Tech.

Through this process, Witness-1 confirmed that Bancorp did not have any relationships with Centra Tech.

   d.  Witness-1 took screenshots of the Centra Tech Website, including a page that misrepresented Bancorp's issuer statement.

     e.  One screenshot that Witness-1 retained stated, among other things:

> The Centra Card Visa Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa U.S.A. Inc. "The Bankcorp"[3] and "The Bancorp Bank" are registered trademarks of The Bankcorp Bank © 2014. Use of the Card is subject to the terms and conditions of the applicable Cardholder Agreement and fee schedule, if any.

> The Centra Card Mastercard® Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Mastercard International Incorporated. "The Bankcorp" and "The Bancorp Bank" are registered trademarks of The Bankcorp Bank © 2014. Use of the Card is subject to the terms and conditions of the applicable Cardholder Agreement and fee schedule, if any.

   f.  As described above, Witness-1 reviewed a white paper that was posted to the Centra Tech Website in August 2017. Witness-1 recalled that the white paper contained multiple misrepresentations, including about Centra Tech's purported relationship with Bancorp.

   g.  In approximately August 2017, Witness-1 attempted to reach individuals at Centra Tech through, among other methods, the "Contact Us" portion of the Centra Tech Website to request that Centra Tech remove the Bancorp logo and the false statements regarding Centra Tech's purported relationship with Bancorp. Witness-1 did not receive a response from Centra Tech.

---

[3] This excerpt from the Centra Tech Website has not been altered to correct spelling or other errors. In this excerpt, "Bancorp" is also spelled "Bankcorp."

20. Based on my conversations with another representative of Bancorp ("Witness-2") and my review of documents provided by Bancorp, I have learned, in substance and in part, that, on or about August 30, 2017, Bancorp sent a cease and desist notice to Centra Tech to which Centra Tech did not respond.

21. Based on my conversations with a representative of Visa ("Witness-3") and my review of documents provided by Visa, I have learned, in substance and in part, the following:

    a.   On or about October 10, 2017, Visa became aware that Centra Tech was using the Visa name and logo on marketing materials in connection with the Centra Card and the Centra Tech ICO.

    b.   Visa employees researched whether Visa had any relationship, direct or indirect, with Centra Tech.  Visa determined that it had no relationship with Centra Tech.

    c.   Visa employees took screenshots of portions of the Centra Tech Website using and showing the Visa name and trademark, including of purported Centra Cards with the Visa logo.

    d.   On or about October 10, 2017, Visa's Legal Department sent an email to Centra Tech, at support@centra.tech, attaching a cease and desist letter (the "October 10 Letter").  In the October 10 Letter, Visa stated, in part:

> It has come to our attention that Centra Tech ("Centra") is using the Visa-Owned Marks on its site https://www.centra.tech as well as on its various social media sites (e.g., Facebook, Twitter, Instagram, YouTube) and other mediums. It appears Centra is purporting to be an authorized distributor of VISA payment cards utilizing cryptocurrency technology. . . . However, to the best of our knowledge and good faith belief, Centra is not authorized to use the Visa-Owned Marks in this manner, nor is it authorized to issue, sell, or otherwise distribute VISA payment cards. If this is not the case, please advise and explain immediately, i.e., if Centra is working with an authorized Visa Issuing bank.

Visa attached to the October 10 Letter multiple screenshots from the Centra Tech Website in which Centra Tech had misappropriated the Visa trademark, including the following:



    e.  In the October 10 Letter, Visa requested that Centra Tech cease and desist from using Visa's trademarks and "promoting that it is an authorized distributor of VISA payment cards," and for Centra Tech to remove all references to Visa from the Centra Tech Website and any promotional materials. Visa also requested that Centra Tech "identify the bank or financial institution it is working with (if any) to issue a purported VISA payment card product."

    f.  In response to the October 10 Letter, Sharma provided Visa with an acknowledgment that he had received the October 10 Letter, but did not identify any financial institutions with which Centra Tech was working to issue a Visa payment card product.

22. Based on my review of records provided by Centra Tech to the SEC, and which were provided to me in connection with this investigation, I have learned, in substance and in part, the following:

22

a. On or about October 10, 2017, Sharma, using the email address "sam@centra.tech," emailed a response to Visa's October 10 Letter, stating:

> This matter has been brought to my attention. I will have this matter rectified in 48 hours. We are currently in the process of finalizing our Co-branded Prepaid Card Program, but might not meet the Nov 1st lock out deadlines for submission from our issuing bank whom is an authorized visa issuer for card design approval, So can see where this issue might of came from.
>
> However, I have immediately contacted my web developers to remove all issues and I will have this document [a cease and desist acknowledgment] signed and returned within 48 hours.
>
> Thank you,
> Sam Sharma

b. On or about October 11, 2017, Visa responded to Sharma's email, and requested that he "advise of the Visa issuing bank you are working with."

c. On or about October 12, 2017, Sharma responded again via email using the "sam@centra.tech" and stated: "As far as the issuing bank we have an MNDA in place currently. VISA will soon get our information for Card Design approval and program specs from our future issuing bank in the US." Sharma signed the email, "Thank you, Sam."

d. On or about October 14, 2017, Visa responded to Sharma's email, noting that Centra Tech was still using the Visa trademark and Visa name in its promotional materials, including in videos in which Sharma and Trapani appeared, and reiterated its demand that Centra Tech stop using the Visa name. Visa also repeated its request that Sharma identify the bank that Centra Tech was "allegedly working with."

23. Based on my conversations with Witness-3, I have learned that, in response to Visa's multiple requests for Centra Tech to identify the Visa card issuing bank with which it purported to have a relationship, neither Sharma nor anyone at Centra Tech identified such an issuing bank.

23

24. Based on my review of the current version of the Centra Tech Website and a white paper published via the Centra Tech Website, as of March 26, 2018, I have learned that Centra Tech is not currently using the Bancorp, Visa or MasterCard names or logos.

25. As described in paragraph 18.g., above, White Paper-1 represented that Centra Tech held licenses "under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments," in 38 listed states (the "State Licensing List"). Based on my review, on or about March 12, 2018, of a database maintained by the Nationwide Multistate Licensing System, a financial services industry online registration and licensing database, and my review of certain state licensing databases, I have learned, in substance and in part, that the following states on the State Licensing List have no current record for Centra Tech based on available public searches:  Arizona, Connecticut, Delaware, Florida, New Jersey, New York or South Dakota.

26. Based on my review of records provided by the SEC, I have learned, in substance and in part, that, on or about August 3, 2017, the following user profile page appeared on LinkedIn, a business- and employment-oriented social networking service that operates via websites and mobile apps, for "Michael Edwards":



**Michael Edwards**

CEO & Co-Founder of Centra Tech, worlds first Multi-Blockchain Asset Debit Card
connected to a Smart and Insured Wallet.

Centra Tech • Harvard University

Miami, Florida • 500+ &

InMail

Creative professional, loving father, and tech enthusiast. Founding Centra Tech is giving me the mission I wanted to
accomplish which is to create a world connected to cryptocurrencies.

The web address for the user profile was https://www.linkedin.com/in/michael-edwards-20b180145/ (the "Edwards LinkedIn Page"). The Edwards LinkedIn Page stated that "Michael Edwards" had "launched Centra Tech with the mission to design the world's first multi-blockchain asset debit card" and had managed various aspects of Centra Tech's Centra Card and Centra Wallet programs, including "[e]stablished licensing and partnership terms with Visa & MasterCard."

27. Based on my review of currently-available content on the LinkedIn website, I have learned that the Edwards LinkedIn Page no longer exists.

28. As described in paragraph 18.g., above, White Paper-1 contained the following purported picture of Centra Tech's "CEO & Co-Founder" "Michael Edwards":



Michael Edwards
CEO & Co-Founder

Based on open source searches of this image, I have learned that the picture of "Michael Edwards" in White Paper-1 is actually a picture associated with an individual named Andrew Halayko, a Canadian physiology professor. For example, I located the following pictures of Andrew Halayko:




Andrew Halayko PhD, FCAHS

29. Based on Internet searches for a "Michael Edwards" who is or was a co-founder or CEO of Centra Tech, I have learned that there is limited information about such an individual. For example, I have found no interviews of "Michael Edwards" in connection with Centra Tech or the Centra Tech ICO, and the name "Michael Edwards" no longer appears on the Centra Tech Website or Centra Tech online promotional materials. Based on the information described above, and based on my training, experience, and participation in this investigation, I believe that a "Michael Edwards" who was at some point "CEO & Co-Founder" of Centra Tech may not exist.

<u>Probable Cause Regarding the Subject Workspaces</u>

30. As described above, Centra Tech and its principals used the Internet extensively to advertise the Centra Tech ICO and Centra Tech's various purported products. Based on my review of Centra Tech's social media accounts, including its Twitter and Facebook pages, and the Centra Tech Website, I have also learned that Centra Tech frequently directed the public to its Slack workspaces, hosted by Slack, for further information and inquiries. For example:

a. Centra Tech's Twitter account, @centra_card, posted messages urging Twitter users to join its Slack workspaces and channels, including with links to sign-up pages, on multiple occasions beginning in approximately July 2017 through approximately December 2017. For example:

i. On or about July 28, 2017, Centra Tech posted the following message: "Our Slack System is working again. Sign up at https://t.co/8huEZagi1M or https://t.co/V3Nb40oCHW."

ii. On or about August 14, 2017, Centra Tech posted the following message: "Come join our slack and get all the updates first: https://t.co/ufrO18JNhl."

iii. On or about September 10, 2017, Centra Tech posted the following message: "Come join the Centra Slack conversation and get all the updates first hand! Go to https://t.co/8huEZagi1M for the invite!"

iv. On or about December 12, 2017, Centra Tech posted the following message: "#Centra Tech held its first Live Chat AMA in our community #slack channel today. Questions and Answers will be posted on our Sub #reddit afterwards for viewing. We will also set our AMA thread in Reddit to collect questions from those outside the Slack community daily. Thank you."

b. Centra Tech's Facebook page, https://www.facebook.com/CentraCard (the "Centra Facebook Page"), also posted messages encouraging Facebook users to join Centra Tech's Slack workspaces and channels on multiple occasions beginning in approximately August 2017 through approximately December 2017. For example:

i. On or about August 2, 2017, Centa Tech posted the following message on the Centra Facebook Page: "Join our slack guys! Http://slack.centra.tech - Auto Invite."

ii. On or about September 10, 2017, Centra Tech posted the following message on the Centra Facebook Page: "Come join the Centra Slack conversation and get all the updates first hand! Go to http://slack.centra.tech for the invite!"

iii. On or about December 15, 2017, Centra Tech posted the following message on the Centra Facebook Page about a Centra Teck Slack channel conversation: "Another concluded daily #slack AMA. Transparency is key to success. #Centra Tech firmly believes in that with all of our contributors and users. We will post the transcript on our subreddit later today. Thanks." Based on my training, experience, and participation in this investigation, I know that "AMA" is an acronym for "ask me anything," and an "AMA" on Slack refers to a question and answer session.

31. Based on my review of publicly available information regarding Centra Tech's Slack workspaces, I have learned that Centra Tech used Slack to respond to questions and criticisms from the public and advertise and promote Centra Tech products. For example, I have learned that, on or about October 27, 2017, the New York Times published an article by reporter Nathaniel Popper about Centra Tech, its officers, the endorsements that Centra Tech had obtained from two celebrities—boxing champion Floyd Mayweather and popular rapper DJ Khaled—and Centra Tech's misrepresentations, including its assertion that it had business partnerships with Visa and

MasterCard (the "October 27 Article").  Based on my review of reporter Nathaniel Popper's public

Twitter postings, I have learned that, the same day, Nathaniel Popper posted an excerpt from a

Slack workspace in which an individual named "sam," who used the Centra Tech logo as a profile

picture, attempted to defend Centra Tech against some of the statements in the October 27 Article.

"Sam," who I believe, based on my training, experience, and participation in this investigation, is

Sharma, stated, with respect to the October 27 Article, that "There's some truth to it; and some

lies" and "Bad press is good press."  The entire Slack channel excerpt posted by Nathaniel Popper

is below:



32. Based on my review of records provided by Centra Tech to the SEC, and based on the

information described in paragraphs 31 and 32, above, I believe that Centra Tech actively used

Slack to communicate with investors in the Centra Tech ICO and others.  In particular, based on

my review of Centra Tech emails provided to the SEC, I have learned, in substance and in part,

the following:

a. Throughout approximately September and October 2017, Sharma, using the email address "sam@centra.tech," Trapani, using the email address "ray@centra.tech," and Farkas, using the email address "robert@centra.tech," received emails from individuals discussing Centra Tokens which in many instances included those individuals' Slack contact information.

b. Centra Tech appears to have maintained a spreadsheet of information regarding individuals who signed up to join Centra Tech's Slack workspaces, and which listed the individuals' Slack usernames, among other information.

c. On or about October 1, 2017, Farkas received an email from "feedback@slack.com," that provided "Centra's Weekly Summary" of activity in its Slack workspace. The summary provided information about activity on Centra Tech's Slack workspace, including the following: "Your members sent a total of **23,409 messages** last week (that's 22,922 fewer than the week before). Of those, **51% were in public channels**, **6% were in private channels**, and **43% were direct messages**. Your members also uploaded **209 files** (that's 211 fewer than the week before)."

33. Based on my review of records provided by Slack to the FBI, I have learned, in substance and in part, the following:

a. Centra Tech had multiple slack workspaces associated with various Slack "teams":

i. The "Centrä" team had a Slack team subdomain at "centratech.slack.com," Subject Workspace-1, and was a free workspace. Subject Workspace-1 was created on or about July 11, 2017 and is a free workspace.

ii. The "CENTRA TECH" team had a "Slack team subdomain," or workspace, at "Centra-tech.slack.com," Subject Workspace-2. Subject Workspace-2 was created on or about August 31, 2017 and is a free workspace.

iii. The "CentraAdmin" team had a Slack team subdomain at "centraadmin.slack.com," Subject Workspace-3. Subject Workspace-3 was created on or about September 27, 2017 and is a paid workspace. Slack records show that payments for Subject Workspace-3 were made by Trapani and Sharma, and linked to Centra Tech's company name and associated with Sharma's address.

iv. The "Centrateam" team had a Slack team domain at "Centrateam.slack.com," Subject Workspace-4, and a subdomain at "Centrateam1.slack.com," Subject Workspace-5. Slack records indicate that Subject Workspace-4 and Subject Workspace-5 were created on or about January 12, 2018 and are free workspaces.

v. The "Centra Work" team had a Slack team subdomain at "centrawork.slack.com," Subject Workspace-6. Subject Workspace-6 was created on or about January 12, 2018 and is a paid workspace. Slack records show that payments for Subject Workspace-6 were made by Farkas and linked to Centra Tech's name and address.

b. Sharma, Trapani and Farkas each have Slack user accounts linked to their Centra Tech email addresses—sam@centra.tech, ray@centra.tech, and robert@centra.tech—and which accessed various Subject Workspaces multiple times from approximately August 2017 through in or about March 2018. For example:

i. Sharma accessed Subject Workspace-3 for approximately 1,092 sessions between approximately September 28, 2017 and February 25, 2018, and Subject Workspace-6 for approximately 827 sessions between approximately January 12, 2018 to March 6, 2018; and.

ii. Trapani accessed Subject Workspace-2 for a session on or about August 31, 2017.

iii.   Farkas accessed Subject Workspace-1 for a session on or about August 31, 2017; Subject Workspace-5 for a session or about January 12, 2018; and Subject Workspace-6 for approximately 911 sessions from between approximately January 12, 2018 and March 6, 2018.

<u>Evidence, Fruits and Instrumentalities</u>

34. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on the Provider's servers associated with the Subject Workspaces will contain evidence, fruits, and instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant.

35. In particular, I believe the Subject Workspaces are likely to contain the following information:

- evidence of the Subject Offenses including a scheme to sell unregistered securities via the Centra Tech ICO and to defraud investors, including but not limited to misrepresentations to victim-investors, false statements and falsified records concerning Centra Tech's business and partnerships, agreements to engage in unlawful conduct, financial, banking, and tax records reflecting the use of investor funds, and references to or discussion of unlawful conduct in connection with investor funds;

- communications constituting or in furtherance of the Subject Offenses and relating to a scheme to sell unregistered securities via the Centra Tech ICO and to defraud investors, including but not limited to fraudulent representations to investors, electronic messages and communications to investors or co-conspirators containing falsified documents, communications between individuals working for Centra Tech relating to the fraudulent scheme, and financial, banking, and tax records relating to a scheme to defraud in connection with the Subject Offenses;

- evidence reflecting preparation for a crime, such as documents relating to the establishment of corporate entities, documents used to solicit investments, such as Centra Tech's white papers, the creation and management of bank accounts, and financial, banking, and tax records relating to a scheme to defraud in connection with the Subject Offenses;

- evidence, including communications, reflecting state of mind, with respect to the commission of the Subject Offenses, including but not limited to electronic communications among co-conspirators;

- information concerning the identities and locations of co-conspirators or victims of the Subject Offenses;

- information concerning the location of other evidence of the Subject Offenses, including but not limited to electronic messages and communications reflecting registration of other online accounts or bank accounts potentially containing relevant evidence; and

- information concerning the passwords or other information of Sharma, Trapani, Farkas or co-conspirators of the Subject Offenses needed to access the user's computer or other online accounts.

36. The requested Warrant and Order is limited to items sent, received, created, posted, modified, archived or exported between July 11, 2017 and the date of this Warrant, inclusive. This time period allows the collection of documents during the period of time reasonably preceding the Centra Tech ICO, which, for the reasons described above, was central to the fraud, and relevant documents after the Centra Tech ICO indicating dispersal of funds, lulling of investors, consciousness of guilt, and the like.

### III. Review of the Information Obtained Pursuant to the Warrant

37. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records. Accordingly, the warrant requested herein will be transmitted to the Provider, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 14 days from the date of service. Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachment A to the proposed warrant.

38. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all electronic messages, communications and files.  This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure.  Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure.  As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with electronic messages and communications, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text.  Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

**IV.  Request for Non-Disclosure and Sealing Order**

39. The existence and scope of this ongoing criminal investigation is not publicly known. As a result, premature public disclosure of this affidavit or the requested warrant could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  In particular, given that targets of the investigation are known to use computers and electronic communications in furtherance of their activity, the targets could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were they to learn of the Government's investigation.

40. Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of 180 days from issuance, subject to extension upon application to the Court, if necessary.

41. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**V. Conclusion**

42. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

Brandon Racz
Special Agent, FBI

Sworn to before me this
30th day of March, 2018

S/Barbara Moses
HONORABLE BARBARA MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| In the Matter of a Warrant for All Content and Other Information Associated with Six Slack.com Workspaces, all Maintained at Premises Controlled by Slack Technologies Inc, USAO Reference No. 2018R00088. |

**18 MAG    2675**

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Slack Technologies Inc ("Provider")
        Federal Bureau of Investigation ("Investigative Agency")

1.        **1. Warrant.** Upon an affidavit of Special Agent Brandon Racz of the Federal

Bureau of Investigation, and pursuant to the provisions of the Stored Communications Act, 18

U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant provisions of Federal Rule of

Criminal Procedure 41, the Court hereby finds there is probable cause to believe that the Slack.com

workspaces (a) centratech.slack.com ("Subject Workspace-1"); (b) Centra-tech.slack.com

("Subject Workspace-2"); (c) centraadmin.slack.com ("Subject Workspace-3"); (d)

Centrateam.slack.com ("Subject Workspace-4"); (e) Centrateam1.slack.com ("Subject

Workspace-5); and (e) centrawork.slack.com ("Subject Workspace-6," together with Subject

Workspace-1, Subject Workspace-2, Subject Workspace-3, Subject Workspace-4, and Subject

Workspace-5, the "Subject Workspaces"), maintained at premises controlled by the Provider,

contain evidence, fruits, and instrumentalities of crime, all as specified in Attachment A hereto.

Accordingly, the Provider is hereby directed to provide to the Investigative Agency, within 14

days of the date of service of this Warrant and Order, the records specified in Section II of

Attachment A hereto, for subsequent review by law enforcement personnel as authorized in

Section III of Attachment A.   The Government is required to serve a copy of this Warrant and

Order on the Provider within 14 days of the date of issuance. The Warrant and Order may be served via electronic transmission or any other means through which the Provider is capable of accepting service.

     **2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence and flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of 180 days from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

     **3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

         _____        _____
         Date Issued                  Time Issued

                                  _____
                                     **S/Barbara Moses**
                               UNITED STATES MAGISTRATE JUDGE
                               SOUTHERN DISTRICT OF NEW YORK

**Search Attachment A**

### I. Subject Accounts and Execution of Warrant

This warrant is directed to Slack Technologies Inc (the "Provider") and applies to all content and other information within the Provider's possession, custody, or control associated with the following Slack.com workspaces: (a) centratech.slack.com ("Subject Workspace-1"); (b) Centra-tech.slack.com ("Subject Workspace-2"); (c) centraadmin.slack.com ("Subject Workspace-3"); (d) Centrateam.slack.com ("Subject Workspace-4"); (e) Centrateam1.slack.com ("Subject Workspace-5); and (e) centrawork.slack.com ("Subject Workspace-6," together with Subject Workspace-1, Subject Workspace-2, Subject Workspace-3, Subject Workspace-4, and Subject Workspace-5, the "Subject Workspaces").

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

### II. Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Workspaces:

a. *Workspace content.* All content maintained on the Subject Workspaces, including all images, videos, documents, files, posts, pins, snippets, direct messages and group direct messages, and all associated timestamps.

b. *Channel content.* All content maintained on private and public channels in the Subject Workspaces, including all images, videos, documents, files, posts, pins, snippets, direct messages and group direct messages, and all associated timestamps.

c. *Archives.* All archived and/or exported content from the Subject Workspaces, including all images, videos, documents, files, posts, pins, snippets, direct messages and group direct messages, and all associated timestamps.

d. *Integrations.* All records of integrations and any content downloaded and preserved from integrations.

e. *Address book information.* All address book, contact list, or similar information associated with the Subject Workspaces.

f. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Workspaces, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

g. *Transactional records.* All transactional records associated with the Subject Workspaces, including any IP logs or other records of session times and durations.

h. *Customer correspondence.* All correspondence with the subscriber or others associated with the Subject Workspaces, including complaints, inquiries, or other contacts with support services and records of actions taken.

i. *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

### III. Review of Information by the Government

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; offering and selling unregistered securities, in violation of Title 15, United States Code, Sections 77e and 77x; wire fraud, in violation of Title 18, United States Code, Section 1343; aiding and abetting the commission of these offenses, in violation of 18, United States Code, Section 2; and conspiring to commit these offenses, in violation of 18, United States Code, Section 371 and 1349 (the "Subject Offenses"), including the following:

- evidence of the Subject Offenses including a scheme to sell unregistered securities via the Centra Tech ICO and to defraud investors, including but not limited to misrepresentations to victim-investors, false statements and falsified records concerning Centra Tech's business and partnerships, agreements to engage in unlawful conduct, financial, banking, and tax records reflecting the use of investor funds, and references to or discussion of unlawful conduct in connection with investor funds, from between July 11, 2017 and the date of this Warrant and Order, inclusive;

- communications constituting or in furtherance of the Subject Offenses and relating to a scheme to sell unregistered securities via the Centra Tech ICO and to defraud investors, including but not limited to fraudulent representations to investors, electronic messages and communications to investors or co-conspirators containing falsified documents, communications between individuals working for Centra Tech relating to the fraudulent scheme, and financial, banking, and tax records relating to a scheme to defraud in connection with the Subject Offenses, from between July 11, 2017 and the date of this Warrant and Order, inclusive;

- evidence reflecting preparation for a crime, such as documents relating to the establishment of corporate entities, documents used to solicit investments, such as Centra Tech's white papers, the creation and management of bank accounts, and financial, banking, and tax records relating to a scheme to defraud in connection with the Subject Offenses, from between July 11, 2017 and the date of this Warrant and Order, inclusive;

- evidence, including communications, reflecting state of mind, with respect to the commission of the Subject Offenses, including but not limited to electronic communications among co-conspirators, from between July 11, 2017 and the date of this Warrant and Order, inclusive;

- information concerning the identities and locations of co-conspirators or victims of the Subject Offenses, from between July 11, 2017 and the date of this Warrant and Order, inclusive;

- information concerning the location of other evidence of the Subject Offenses, including but not limited to electronic messages and communications reflecting registration of other online accounts or bank accounts potentially containing relevant evidence, from between July 11, 2017 and the date of this Warrant and Order, inclusive; and

- information concerning the passwords or other information of Sharma, Trapani, Farkas or co-conspirators of the Subject Offenses needed to access the user's computer or other online accounts, from between July 11, 2017 and the date of this Warrant and Order, inclusive.

3